IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:05CR319-1 |
| | ) | |
| DAVID MILTON HOHN, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

Beaty, District Judge.

This matter is before the Court on the Motion [Document Nos. 10 & 22] of David Milton Hohn ("Defendant") to suppress a number of items seized from Defendant's residence a day after law enforcement officers conducted an alleged emergency "safety search" of Defendant's garage and shed without the benefit of a search warrant. A hearing was held in this matter on January 5, 2006. The Court enters this Memorandum Opinion to record the Court's findings of fact, analysis, and conclusions in this matter.

I.     FINDINGS OF FACT

Based on the evidence presented during the hearing on January 5, 2006, the Court finds the following facts. On November 21, 2003, at approximately 8 p.m., members of the Randolph County Sheriff's Department desired to serve arrest warrants, for possession of methamphetamine, on Matthew Hohn, Defendant's son, and on April Lynn Ward ("Ward").

In order to do so, Deputy J. Hunt and Corporal L. Locke went to 2380 Hohn Road, Matthew Hohn's residence, to serve the arrest warrant. However, at that address the officers only found Ward. They asked Ms. Ward where Matthew Hohn was located, and she told them that he was at his father's (the Defendant's) house. The Defendant lived nearby, at 6405 Canter Road. Ms. Ward, under arrest, then accompanied the officers to the Defendant's residence. She took the officers to an outbuilding (the "Garage") that was adjacent to the residence, approximately 50 feet behind and to the left side of the primary residence. Ms. Ward knocked on the sliding door located at the front of the Garage. The Defendant, who was inside the Garage, asked who was there. Ms. Ward responded that she was with the police and that she and Matthew Hohn were under arrest. Defendant then yelled that they had better not be under "f**king arrest." Defendant slid the door of the Garage apart by several inches, but not far enough for the officers to see inside the building. Deputy Hunt asked him where Matthew Hohn was, and Defendant stated that he was in the back of the Garage. Deputy Hunt asked Defendant if he could enter the Garage in order to arrest Matthew Hohn. Defendant said "no," slammed the door shut, and told the officers that he would get Matthew Hohn from the back of the building.

During the next several minutes, after taking Ms. Ward back to a patrol car which was parked in the driveway in front of the garage, the officers each began walking on either side of the Garage, with Deputy Hunt walking to the left and Corporal Locke walking to the right, in order to see if Matthew Hohn would try to leave the Garage from another exit. A pull-down garage door was located on the left side, where Deputy Hunt was walking, while the right side

2

did not have any openings. Deputy Hunt noticed that someone inside the Garage was pulling the left-side garage door down until it was only open about a foot from the ground. Additionally, Deputy Hunt heard the sound of movement inside the Garage. He then noticed a "smokey cloud" flowing out of the Garage "like a fog machine" under the side garage door. The cloud, which smelled like ammonia, caused Deputy Hunt to vomit. Deputy Hunt then returned to the front of the Garage, where he watched the smokey cloud build up and enclose the building. Ten to fifteen minutes later, Matthew Hohn emerged from the building, showing no signs of illness or respiratory distress. Deputy Hunt placed Matthew Hohn under arrest, and asked him about the ammonia smell and the whereabouts of the Defendant. Matthew Hohn stated that he had been using ammonia to clean aluminum wheels. He further stated that he did not know where his father was. The officers placed Matthew Hohn in a patrol car and called the drug detectives for the Randolph County Sheriff's Department, because Deputy Hunt believed that he had discovered a methamphetamine laboratory. The officers then moved their cars to the end of the driveway, closest to the road, and proceeded to block off the road. At this point, and continuing for the next forty-five minutes, while the officers waited for the arrival of the drug detectives, the smokey cloud hovered over the entire Garage, to the point where it was "thick enough you couldn't hardly make out the Garage," according to Deputy Hunt. It was allegedly a calm, cool night.

After approximately forty-five minutes, the narcotics detectives, including Detective Tim James, arrived at the scene and were briefed by Deputy Hunt, who had set up to watch the

perimeter of the property. Detective James testified that he had received an anonymous and non-confidential tip through Crime Stoppers six months earlier that the Defendant's residence was involved in producing methamphetamine. Detective James did not feel that he had sufficient probable cause to pursue the matter further at that time. Based in part on this information, Detective James made the decision to conduct what he considered to be a "safety sweep" of the Garage because Matthew Hohn had stated that he did not know where his father was located and the officers allegedly feared that the Defendant had succumbed to the noxious gas cloud. In addition, the safety sweep was initiated by Detective James as being necessary for officer safety, in order to ensure that the Defendant or some third party was not lying in wait in the outbuilding because a deputy would be posted on the property until a search warrant could be obtained. More significantly to the Court, it appears that, as Detective James explained, he did not get a search warrant before conducting the safety sweep because he could not get a Superior Court judge, (as opposed to a magistrate judge, who is available 24-hours a day), to sign the search warrant until the next day. According to Detective James, although there is no legal support for his position, he believed that only a signature by a Superior Court judge would ensure that any hazardous materials would not be destroyed (thereby destroying evidence) until a hazardous materials company would be available to take possession of any chemicals associated with methamphetamine production. Thus, according to Detective James, although a magistrate judge might have been available, a warrant signed by a magistrate judge would only ensure the destruction of evidence, which Detective James did not want to occur. Again, this explanation

4

does not appear within any exception to the warrant requirement for obtaining a search warrant in the absence of probable cause or consent.

During the alleged "safety sweep," the officers did not find the Defendant. However, they did report discovering Red Devil Lye, an oxygen cylinder commonly used to store anhydrous ammonia, firearms, and a jar containing a bi-layer liquid consistent with separated ephedrine, all in the Garage. Detective James said he and his officers were not wearing any particular protective gear in order to conduct the safety sweep, but were not particularly concerned because at that point the doors of the garage were open, so as to provide adequate ventilation. It is interesting to note that it was reported that the front Garage door had been open prior to Detective James' arrival. Additionally, during the safety sweep, Detective James noticed that the door to a smaller outbuilding (the "Shed"), adjacent to the residence and the larger outbuilding, was open and that there was a light on the inside. From the doorway, Detective James testified that he could see within the Shed what he perceived as a hydrogen chloride gas generator, table salt, drain cleaner, and other chemicals commonly used in the manufacture of methamphetamine.

Having this information in hand, the following day, Detective James applied for a search warrant. The Affidavit[1] filed by Detective James stated that he had smelled a strong

---

[1] In more particularity, the Affidavit states:

On November 21, 2003 Deputies J. Hunt and L. Locke with the Randolph County Sheriff's Office went to 2380 Hohn Rd. to serve criminal papers on Matthew David Hohn and April Lynn Ward.

5

The Deputies founds April Ward at the residence. The Deputies asked April Ward where Matthew Hohn was, April Ward advised to the Deputies that Matthew Hohn was at his father's house. Matthew's father is David Milton Hohn. David Milton Hohn lives at 6405 Canter Rd. April Ward accompanied the Deputies to David Hohn's residence. Matthew and David Hohn were in an outbuilding. Deputy Hunt told April Ward to ask for Matthew Hohn. After knocking on the door David Hohn came to the door and asked who was there. April Ward said that she was here with the police and that herself and Matthew Hohn were under arrest. David Hohn then yelled that we better not be under "fucking arrest" then opened the building door about three inches and looked out to see what was going on. Deputy Hunt asked David Hohn where Matthew Hohn was and David Hohn stated that he was in the back of the building. Deputy Hunt asked David Hohn if he would let him in the building to place Matthew Hohn under arrest. David Hohn said no and slammed the door in Deputy Hunt's face and stated that he would get David [sic.] Hohn from the back of the building. Deputy Hunt went to the left side of the building and Deputy Locke went to the right side of the building. Deputy Hunt was watching a large door on the left side of the building when the lights went out in the garage and someone pulled the garage door down closing it most of the way. Deputy Hunt then started smelling a strong odor of ammonia coming from the building and also a cloud of smoke from the partially closed door. Approx 10-15 min later Matthew Hohn came walking out of the front door of the garage with his hands up. Deputy Hunt placed subject under arrest. Deputy Hunt and Deputy Locke backed away from [the] building with Matthew Hohn in custody and contacted the vice narcotics unit.

Lt. T. James, Sgt. D. Joyce and Det. J. Martin with the Randolph County Sheriff's Office Vice and Narcotics Unit along with Special Agent T. Rosencrans with the S.B.I. arrived at 6405 Canter Rd. The Detectives responded to the scene and upon approaching the scene a strong scent of ammonia could be smelled. In plain view Detectives could see Red Devil Lye, sodium, a HCL gas generator and other chemicals associated with methamphetamine labs.

6

scent of ammonia and that in plain sight he had seen Red Devil Lye, salt, and the HCL gas

generator. While this list includes items found in both the Garage and the Shed, Detective James

testified that the inclusion of Red Devil Lye was, in fact, a typographical error, in that he only

intended to include items from the Shed in the Affidavit. Detective James sought permission to

search the Garage and Shed, the residence, and Defendant's vehicles. The search warrant was

granted and executed, leading to the seizure of additional evidence in Defendant's residence of

firearms, including a machine gun, and a pill wash used to separate ephedrine from the rest of

the Sudafed pill material. In the Garage and Shed, detectives seized firearms, including a silencer,

and other items associated with the methamphetamine manufacturing process.

Based upon the evidence recovered from Defendant's property, Defendant was indicted

for attempting to commit a drug offense by manufacturing 50 grams or more of

methamphetamine, possession with intent to distribute methamphetamine, maintaining a drug-

involved premises, possession of firearms in furtherance of a drug trafficking crime, possession

---

This Applicant is familiar with the investigations of methamphetamine labs in and around Randolph County and has attended the DEA Clandestine Laboratory Investigation Safety/Certification Program. This Applicant through investigating methamphetamine laboratories has found it common for there to be a strong smell of ammonia in methamphetamine production and the chemicals Red Devil Lye, sodium, and a HCL generator to be used in the production of methamphetamine.

On July 30, 2003 the Randolph County Crime Stoppers received information that David Milton Hohn at 6405 Canter Rd and Matthew David Hohn at 2380 Hohn Rd. was involved in methamphetamine labs.

7

of a machine gun, and possession of firearms and a silencer that were not registered in the

National Firearms Registration and Transfer Record. Defendant has moved to suppress

everything recovered by police based on what he contends was an invasion of his curtilage and

an unconstitutional search.

## II.   ANALYSIS OF MOTION TO SUPPRESS

The Fourth Amendment protects "the right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV.

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted

without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few

specifically established and well-delineated exceptions.'" Schneckloth v. Bustamonte, 412 U.S.

218, 219, 93 S. Ct. 2041, 2043 (1973) (quoting Katz v. United States, 389 U.S. 347, 357, 88 S. Ct.

507, 514(1967)). One of these exceptions to the warrant requirement is based on "exigent

circumstances" where, for example, officers are responding to an emergency, are in hot pursuit

of a fleeing felon, are confronted with imminent destruction of evidence, or there is a "risk of

danger to the police or to other persons inside or outside the dwelling." Minnesota v. Olson,

495 U.S. 91, 100, 110 S. Ct. 1684, 1690 (1990); see also United States v. Dart, 747 F.2d 263, 267

(4th Cir. 1984) (collecting cases as to each of the various types of exigent circumstances).  The

burden is on the Government to show the existence of such exceptional circumstances. See Dart,

747 F.2d at 267.  The inquiry into whether exigent circumstances existed must focus on what an

objective police officer could reasonably believe.  See United States v. Reed, 935 F.2d 641, 643

(4th Cir. 1991).

In the present case, the Government concedes that the officers conducted the "safety sweep" of Defendant's garage and shed without a warrant. However, the Government contends that the search was nevertheless permissible based upon exigent circumstances, based on the reasonableness of the officers' conduct given the circumstances. In response, Defendant contends that there were four violations of Defendant's rights. First, Defendant argues that there were, in fact, two unauthorized searches of Defendant's curtilage: (1), when Deputy Hunt and Corporal Locke walked along the sides of the Garage, and (2), when drug detectives entered Defendant's premises, walked around the Garage, and discovered the Shed. Second, Defendant contends that there were no exigent circumstances to justify a search of the Garage without a search warrant. Third, Defendant contends that the Affidavit in support of the search warrant was based on evidence obtained in violation of Defendant's Fourth Amendment rights. Fourth, and finally, Defendant contends that there was an insufficient nexus between the Garage and the house and the cars to justify such a broad request for a search in the search warrant. The Court will consider each of these contentions in turn.

A.    Entry of Deputy Hunt and Corporal Locke onto Defendant's Curtilage

Defendant first contends that Deputy Hunt and Corporal Locke executed an illegal search when they either entered Defendant's premises, or more specifically, when they began walking down the sides of the Garage. Defendant, citing to <u>Rogers v. Pendleton</u>, 249 F.3d 279 (4th Cir. 2001), argues that the Fourth Circuit Court of Appeals has held that, in order to search

9

the curtilage of a home, a police officer must have probable cause plus a warrant or exigent circumstance, or some other exception to a warrant requirement. In this case, Defendant argues, police officers had neither probable cause nor exigent circumstances.

Buildings located within the curtilage of a home are protected by the Fourth Amendment. See Alvarez v. Montgomery County, 147 F.3d 354, 359 (4th Cir. 1998) ("[W]e reiterate that the area within the curtilage of the home 'typically is afforded the most stringent Fourth Amendment protection.'") (internal quotation marks omitted). However, the Court finds that the existence of the arrest warrant allowed the officers to walk up to the front of the Garage and ask for Matthew Hohn to come out. See Rogers, 249 F.3d at 289 (4th Cir. 2001) (holding that, ordinarily, there is no Fourth Amendment violation when police "knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants."); see also United States v. Cephas, 254 F.3d 488, 494 (4th Cir. 2001) ("Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned violation of the person's right of privacy, for any one openly and peaceably . . . to walk up the steps and knock on the front door of any man's 'castle' . . . ."). Here, the lights were off in the residence and Ms. Ward directed the officers to the Garage as the likely location to find both Matthew Hohn and the Defendant. Thus, the officers did not need to approach the house prior to approaching the Garage, and doing so did not violate the Fourth Amendment. See Alvarez, 147 F.3d at 358 (stating that police officers may "enter a person's backyard without a warrant when they have a legitimate law enforcement

10

purpose for doing so.").

As for the officers' decision to walk along the sides of the garage, while not precedential, the unpublished Fourth Circuit case of <u>Edens v. Kennedy</u>, 112 Fed. Appx. 870, 875 (4th Cir. 2004), <u>cert. denied</u>, 125 S. Ct. 1361 (2005), is persuasive that such an action did not violate Defendant's Fourth Amendment rights. In <u>Edens</u>, the court held that where an owner of a home "encloses the curtilage with a fence, locks the gate, and posts 'No Trespassing' signs, the effect for Fourth Amendment purposes is to extend the walls of the home to the edge of the curtilage," thereby imbuing the curtilage with an "elevated expectation of privacy." In the instant matter, Defendant had no signs up concerning trespassing, nor did he enclose his house (or the Garage) with a fence or locked gate. There were no physical barriers set up to prevent the officers from walking a few feet down either side of the Garage, nor was there any notice to the officers that such conduct was impermissible. Defendant did not present any evidence to contradict the officer's statements that the Defendant, upon encountering the police officers, did not immediately order them to leave his property, but instead stated that he would go find Matthew Hohn and send him out of the Garage. Nor did Defendant present any evidence that the officers conducted a search of the curtilage, other than by entering onto it, or had any purpose to do so. Instead, the uncontroverted testimony of Deputy Hunt and Corporal Locke was that they each walked along one side of the Garage in order to see whether Matthew Hohn would attempt to escape the Garage by a door other than the front, and in so doing, immediately noticed the odor of ammonia coming from inside the building. Additionally, Deputy Hunt testified that the

11

ammonia smell and resulting cloud eventually became so strong that it could be smelled by an individual standing at the front of the garage. Accordingly, the officers were in a place that they were allowed to be when they smelled ammonia. See United States v. Taylor, 90 F.3d 903, 908-09 (4th Cir. 1996) (holding that where officers approached the front door of defendant's residence and then saw through the front window a large quantity of currency and drugs inside, such items were in plain view and officers' actions did not constitute a search under the Fourth Amendment).

B. Entry of Detective James onto Defendant's Curtilage

Unlike Deputy Hunt and Corporal Locke, Detective James and other officers from the Randolph County Sheriff's Department had no arrest warrant purpose, or for that matter, any purpose, other than a desire to search, for entering Defendant's curtilage. Accordingly, for these officers' actions to be permissible, they needed to have both probable cause and a warrant or probable cause and exigent circumstances. See Cephas, 254 F.3d at 494-95.

To establish exigency, law enforcement officials must be able to show the Court that: (1), there were reasonable grounds to believe that there was an emergency at hand and an immediate need for their assistance for the protection of life and property, (2), the search must not be primarily motivated by the intent to arrest and seize evidence, and (3), there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched. See United States v. Morales Cervantes, 219 F.3d 882, 888 (9th Cir. 2000). Officers must be able to point to specific and articulable facts to show that there is an emergency.

12

See United States v. Reid, 226 F.3d 1020, 1028 (9th Cir. 2000).

In this case, when asked why the officers decided to search the property without getting a warrant, Detective James' first answer was that a warrant would not be available until the next day, because in order to handle hazardous materials, the officers needed the warrant to be signed by a Superior Court judge and not a magistrate judge. Then, when prompted by Government counsel, Detective James also said that the officers did not know the location of the Defendant, because no one had seen him leave the Garage. Thus, the officers were concerned that he may have been dying (or lying in wait) in the Garage. Of course, Detective James also stated that the doors to the Garage were open upon his arrival at the scene, thus he felt the Garage had aired out enough in order for the officers to conduct the safety sweep without any protective equipment.[2]

The Court finds that no reasonable officer, including those on the scene, would have believed, or actually believed, that there was an emergency concerning the Defendant in this instance. For example, Deputy Hunt testified that the ammonia smell had made him ill. Yet, when Matthew Hohn emerged from the Garage, Deputy Hunt was not concerned with Matthew Hohn's health, even though he had been in the building while the ammonia cloud was growing for up to fifteen minutes, and even though he allegedly walked through the ammonia cloud in order to leave the building. At this point, after arresting Matthew Hohn, the officers retreated

---

[2] It is unclear to the Court who opened the doors of the Garage and at what point this occurred, other than prior to Detective James' arrival.

to set up a perimeter around the house. They did not thereafter call for medical personnel to come to the scene for Defendant's benefit, or to check on the health of Matthew Hohn. Instead, an ambulance arrived more than forty-five minutes later solely to check on the condition of Deputy Hunt.

The Government makes the argument that the situation was an emergency because the Defendant, or some other person, could have been lying in wait inside the Garage. The Government cites to <u>Maryland v. Buie</u>, 494 U.S. 325, 110 S. Ct. 1093 (1990), for the proposition that an officer securing a scene after an arrest but prior to obtaining a search warrant may conduct a protective sweep. However, in that case, the U.S. Supreme Court wrote that a protective sweep is justified where "the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." <u>Id.</u> at 337, 110 S. Ct. at 1099-1100. In this case, the officers did not testify to a single specific and articulable fact that showed that the Garage contained any individual other than the Defendant, nor did the officers testify to any set of facts that showed that the Defendant posed a danger to the officers during the time they had previously set up a perimeter around the house while waiting for the detectives.

Based on the testimony of Deputy Hunt, Corporal Locke, and Detective James, the Court finds that the real reason that police officers decided to conduct a "safety sweep" at the time they did was not based on any emergency, but was instead based on a belief that only a warrant signed by a Superior Court Judge would be appropriate to prevent the destruction of

14

hazardous material, notwithstanding the fact that a search warrant could have been procured from a magistrate judge prior to a warrant-less entry into the Garage. The Court further finds that no reasonable police officer in this situation would have considered the situation an emergency. Because the "safety sweep" violated Defendant's Fourth Amendment rights, the Court must now consider whether, after excising any item discovered during the safety sweep, including items found in both the Garage and the Shed (which was only discovered because of the safety sweep), the Affidavit that Detective James submitted to a Superior Court judge the following day still supported a probable cause determination.

C.    Probable Cause Determination Absent Impermissibly Gained Information

An affidavit containing erroneous or unconstitutionally obtained information is, nevertheless, valid where that information can be excluded but the affidavit still contains sufficient accurate or untainted evidence to support probable cause. United States v. Karo, 468 U.S. 705, 719, 104 S. Ct. 3296, 3306 (1984). Where there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required to determine if the search warrant was either false or made on the basis of unreliable information. Franks v. Delaware, 438 U.S. 154, 171, 98 S. Ct. 2674, 2685 (1978).

In this case, excluding any evidence developed during the impermissible "safety sweep," the Affidavit still contains these incriminating facts: Deputy Hunt was attempting to serve an arrest warrant on Defendant's son, Matthew Hohn, for possession of methamphetamine; after Deputy Hunt had Ms. Ward knock on the door to Defendant's Garage, Defendant refused to

15

open the door and became angry that the officers were there to arrest his son; thereafter, Deputy Hunt watched the light go out in the Garage, someone pulled the side Garage door down most of the way, and a strong odor of ammonia came out of the building, as well as a cloud of smoke from the partially closed door; about fifteen minutes later, Matthew Hohn emerged from the Garage. In addition, although not enough standing alone to support the issuance of a search warrant, the Affidavit also permissibly notes that on July 30, 2003, the Randolph County Crime Stoppers received a non-confidential tip that the Defendant at 6405 Canter Road was involved in a methamphetamine laboratory.

Based upon these facts alone, the Court finds that the search warrant ultimately obtained was supported by probable cause. See United States v. Clayton, 210 F.3d 841, 845 (8th Cir. 2000) (holding that the police officer "developed probable cause for a search based on his immediate perception of an odor associated with methamphetamine production."); Kleinholz v. United States, 339 F.3d 674, 676-77 (8th Cir. 2003) (holding that police officers had probable cause to believe that the defendant was manufacturing methamphetamine based on an anonymous tip, the arrest of a third party for a drug related offense on the defendant's property, and the smell of a chemical associated with methamphetamine manufacturing). This finding is based on the totality of the circumstances, see Illinois v. Gates, 462 U.S. 213, 230-31, 103 S. Ct. 2317, 2328 (1983), and particularly considers the fact that the substance noticed by both Deputy Hunt and Corporal Locke both smelled like ammonia and appeared as a gas cloud, which is consistent with the properties of anhydrous ammonia. See United States v. Smith, 210 F.3d 760, 761 (7th Cir.

16

2000) (stating that anhydrous ammonia dumped from a car "instantly vaporized, creating a cloud."). Moreover, anhydrous ammonia is almost solely used in this area to produce methamphetamine, according to the uncontroverted testimony of Detective James. While the "safety sweep" of Defendant's property may have violated his Fourth Amendment rights, the Court finds that the search warrant that Detective James eventually obtained still contained enough factual allegations without the tainted evidence to support a probable cause determination, with respect to the Garage and the Shed.

D.      Nexus Between the Garage and the Residence and Vehicles

Defendant's final argument is that if the Affidavit in support of the search warrant is valid, there was an insufficient nexus between the Garage and the residence and the vehicles to justify a search of the residence and vehicles. In support of this argument, Defendant cites to United States v. Freeman, 685 F.2d 942, 949 (5th Cir. 1982), in which the court held that evidence that a defendant has engaged in drug activity does not automatically establish probable cause that evidence of his criminal activity will be found in his home.

The Government responded to this argument by noting that in Freeman, the search of Defendant's home was geographically distant from the alleged drug smuggling that occurred between Dallas, Texas and San Francisco, California. Id. at 949. Additionally, the Freeman court specifically noted that there was "[n]o mention . . . in the affidavit of any suspicious activity occurring at or near the residence." Id. at 950.

The Government also argues that when the manufacturing of methamphetamine is

suspected, the discovery of substances used in the manufacturing process in an outbuilding can provide probable cause for searching a residence. See <u>United States v. Nation</u>, 243 F.3d 467, 470 (8th Cir. 2001) (where officers found evidence of methamphetamine production in a nearby shed, a search warrant including the defendant's residence was appropriate because "the combination of items in the shed created a fair probability that police would discover further evidence of illegal drug activity on the premises.").

A magistrate judge presented with an application for a search warrant must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>United States v. Lalor</u>, 996 F.2d 1578, 1580 (4th Cir. 1993). "The nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." <u>Id.</u> at 1582 (<u>quoting</u> <u>United States v. Anderson</u>, 851 F.2d 727, 729 (4th Cir. 1988)).

However, this Court must consider the Affidavit absent any information gathered by impermissible means during the "safety sweep." Accordingly, without evidence discovered during the purported "safety sweep," the Court finds that there is no information in the Affidavit to support the probable cause necessary to justify a search beyond the Garage and the Shed. See <u>Lalor</u>, 996 F.2d at 1583 ("In this and other circuits, residential searches have been upheld only where some information links the criminal activity to the defendant's residence."). An affidavit must establish a "minimally sufficient nexus between the illegal activity and the

18

place to be searched." <u>United States v. Gonzales</u>, 399 F.3d, 1225, 1230 (10th Cir. 2005). In this case, there is no information in the Affidavit that shows that any evidence as to the production of methamphetamine was likely to be found either in Defendant's house or Defendant's vehicles, other than an anonymous tip that was six-months old at the time and did not appear to specify a location for the methamphetamine lab beyond the generic term "residence."[3] As such, the Court will grant Defendant's Motion to Suppress insofar as it includes any items recovered from Defendant's house or vehicles, but will deny Defendant's Motion to Suppress insofar as it includes items recovered from Defendant's Garage and Shed.[4]

III.    CONCLUSION

For the reasons discussed above, the Court has concluded that no reasonable officer would have believed that an exigent or emergency circumstance existed based upon the

---

[3] Given that the smell of ammonia came out of the Garage and not the house, the Court does not consider that evidence of the tip to be enough to show that evidence of methamphetamine production would be found in the house.

[4] The Court notes at this time that it will not apply the "good faith exception." Under this exception, evidence obtained from an invalidated search warrant will be suppressed only if "the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." <u>See</u> <u>United States v. Leon</u>, 468 U.S. 897, 926, 104 S. Ct. 3405, 3422 (1984). Moreover, police officers are required to "have a reasonable knowledge of what the law prohibits." <u>Id.</u> at 919 n.20; 104 S. Ct. at 3419 n.20. As previously stated, the officers in this case knew they needed a search warrant, but decided not to get one primarily because a Superior Court judge was not readily available, given their concern that having a magistrate judge issue a search warrant would lead to the destruction of evidence found in the Garage. Such an explanation is not an acceptable justification for violating the clear requirement that searches must be conducted with a warrant issued upon probable cause.

unsubstantiated speculation that the Defendant was either passed out on the floor of the Garage or lying in wait to harm the officers setting up a perimeter, so as to justify the "safety sweep." However, the Court finds that after excising any information gleaned by police officers during the purported "safety sweep" from the Affidavit, the Affidavit still includes enough valid information to support probable cause, and thereby, the resulting search warrant for the Garage and Shed. The search warrant as excised, however, does not support a search as broad as that permitted by the signing judge so as to include Defendant's house and vehicles. Accordingly, Defendant's Motion to Suppress [Document Nos. 10 & 22] is granted as to any items police recovered from his house and vehicles, but is denied as to any items police recovered from his Garage and Shed. In essence, based upon the Court's ruling, any charges against Defendant relating to weapons or contraband seized from his house or vehicles are hereby subject to dismissal given that those items were improperly seized from Defendant's house or vehicles. Those items are hereby suppressed.

This, the 20th day of January, 2006.

United States District Judge

Case 1:05-cr-00319-JAB   Document 26   Filed 01/20/06   Page 21 of 21